# UNITED STATES DISTRICT COURT

for the

Middle District of Alabama

| | |
|---|---|
| In the Matter of the Search of<br>*(Briefly describe the property to be searched<br>or identify the person by name and address)*<br><br>INFORMATION ASSOCIATED WITH THE CELLULAR<br>TELEPHONE ASSIGNED CALL NUMBER (334)<br>618-3865 | )<br>)<br>)<br>)<br>)<br>) | Case No. *1:17mj 199-GMB* |

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See Attachment A

located in the _____ Middle _____ District of _____ Alabama _____ , there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☐ contraband, fruits of crime, or other items illegally possessed;

☑ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 21 USC Section 841(a)(1) | Possession with the intent to distribute a controlled substance |
| 21 USC Section 846 | Conspiracy to possess with intent to distribute a controlled substance |

The application is based on these facts:

See Attached Affidavit.

☐ Continued on the attached sheet. *GMB*

☑ Delayed notice of ~~30~~ *30* days (give exact ending date if more than 30 days:  ~~11/22/2017~~ *GMB* ) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's signature*

Heather S. Whelan Holt, Special Agent, FBI
*Printed name and title*

Sworn to before me and signed in my presence.

Date: **August 24, 2017**

_____
*Judge's signature*

City and state:  Montgomery, AL

Gray M. Borden, U.S. Magistrate Judge
*Printed name and title*

IN THE UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF ALABAMA

| | |
|---|---|
| IN THE MATTER OF THE SEARCH OF INFORMATION ASSOCIATED WITH THE CELLULAR TELEPHONE ASSIGNED CALL NUMBER (334) 618-3865 THAT IS STORED AT PREMISES CONTROLLED BY VERIZON WIRELESS | Case No. _____ <br><br> **Filed Under Seal** |

### AFFIDAVIT IN SUPPORT OF
### AN APPLICATION FOR A SEARCH WARRANT

I, SA Heather Whalen Holt, being first duly sworn, hereby depose and state as follows:

### INTRODUCTION AND AGENT BACKGROUND

1.     I make this affidavit in support of an application for a search warrant under Federal Rule of Criminal Procedure 41 and 18 U.S.C. §§ 2703(a), 2703(b)(1)(A) and 2703(c)(1)(A) for information associated with a cellular telephone assigned call number (334) 618-3865 (the "Target Cell Phone"), whose service provider is Cellco Partnership Inc., d/b/a Verizon Wireless Inc. (Verizon Wireless), a wireless telephone service provider headquartered at 140 W. St. New York, NY 10007.

2.     The Target Cell Phone is described herein and in Attachment A, and the information to be seized is described in Attachment B.

3.     I am a Special Agent with the Federal Bureau of Investigation, and have been since October 2008. Prior to my employment with the FBI, I was an intelligence officer with the United States Army for approximately five years, and I continue to serve in the Army reserves today. In sum, I have been employed in law enforcement for nine years and have worked exclusively on narcotics investigations for approximately four years.

4.      As an FBI Special Agent, I have participated in long-term historical investigations of drug distribution organizations. I have been involved in the debriefing of defendants and others who had knowledge of the distribution and transportation of controlled substances as well as the laundering and concealing of proceeds derived from drug dealing. Furthermore, I have supervised and/or participated in physical surveillance, electronic surveillance, undercover transactions, controlled drug purchases, and the execution of search warrants.

5.      The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other agents and witnesses. This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

6.      Based on the facts set forth in this affidavit, there is probable cause to believe that violations of Title 21, United States Code, Section 841(a)(1) and Section 846, have been committed, are being committed, and will likely continue to be committed by Charles Hunter BRIDGES and other individuals. There is also probable cause to believe that the information described in Attachment B will constitute evidence of these criminal violations, and will lead to additional evidence that certain individuals engaged in the commission of these offenses.

## PROBABLE CAUSE

7.      The FBI is currently investigating Charles Hunter BRIDGES, a Dothan, Alabama based subject who has been identified as a common source of supply for two substances: (i) crystalline methamphetamine, a highly purified version of methamphetamine with a crystal-like appearance, which is commonly called Ice (hereinafter "Ice"), and (ii) heroin, for subjects in Dothan, Alabama and surrounding areas.

2

8.     A check through the National Crime Information Center (NCIC) revealed that BRIDGES has previously been arrested for possession of methamphetamine on two separate occasions. First, on or about January 25, 2016, BRIDGES was arrested for possession of methamphetamine at his residence, 200 Blissett Drive, Apt. 21, Dothan, Alabama. Second, on or about June 21, 2017, BRIDGES was arrested for possession of methamphetamine during a traffic stop in the 700 Block of East Cottonwood Road Dothan, Alabama. It is important to note that both sets of the seized methamphetamine are still undergoing chemical analysis at the Alabama Department of Forensic Sciences. Moreover, based on my experiences in working in the Dothan, Alabama area, I am familiar with BRIDGES' reputation as a drug dealer, which has been corroborated through other reliable sources including both law enforcement and various members of the public.

### BACKGROUND OF THE CHS

9.     The FBI has developed a reliable Confidential Human Source (hereinafter "CHS"). The CHS does not have any known criminal convictions, though he/she was known to deal Ice in the past.

10.     The CHS has previously provided reliable information to the FBI on three unrelated cases which has resulted in the arrest of three individuals regarding illegal drug and firearm possession. Furthermore, the CHS has introduced the FBI to an Undercover Employee (UCE) of an unrelated target, which has resulted in two separate controlled purchases for a total of two kilograms of Ice.

11.     The CHS previously knew BRIDGES, and had purchased controlled substances, primarily Ice, from BRIDGES in the past. Based on those interactions, the CHS knew BRIDGES' cell phone number, i.e., the Target Cell Phone's number, (334) 618-3865.

3

<u>JULY COMMUNICATIONS</u>

12.     On July 24, 2017, the CHS, under the supervision of the FBI Task Force, made two recorded phone calls to BRIDGES, in an effort to purchase Ice (first call) and heroin (second call). Both of the telephone calls were made to the Target Cell Phone.  The first recorded phone call consisted of the following conversation:

> HB (Hunter BRIDGES): Hello
>
> CHS: Hey
>
> HB: Hey
>
> CHS: What you doing?
>
> HB: I'm running around like a chicken with my head cut off. I just got up. I'm about to jump in the shower. I'm trying to get ready. I go to get my kids to a doctor's appointment at 12:40.
>
> CHS: Damn
>
> HB: I got a lot going on right now.
>
> CHS: Alright so can you, can you, be able to, I want to make this UI ["UI" stands for Unintelligible][1]
>
> HB: I can, I can, because I need you, I need some money.  I just need a minute to get my thoughts together.  Let me get ready. Get my boys to their appointment.  And then I can.
>
> CHS: Yeah I need to make some money too, I'm about to be homeless.
>
> HB: Ok
>
> CHS: And I can't live there in Alex drive no more
>
> HB: You got some cash right?
>
> CHS: Yeah, yeah, yeah
>
> HB: Ok
>
> CHS: But not a whole lot, though

---

[1] It is also important to note that English is not the CHS's native language.

HB: UI cash that would help me out

CHS Uhh? How much are you trying to, I mean, the seven grams?

HB: Seven?

CHS: Seven grams

HB: Ummm

CHS: And don't give that bullshit man, they're going to, you know, I don't want know bullshit stuff

HB: No its good stuff, its good stuff, but

CHS: But what?

HB: Like 225, 230 probably

CHS: The what?

HB: Yeah, but that's for the good stuff now, that's for the good stuff. Now I can get you some alright stuff, that's like not as good, for like probably 175, 2.

CHS: No we don't need that bad stuff, UI, Mexican, you see what I'm saying, I mean

HB: Well that's up to you, I mean its quality over quantity.

CHS: Can you do, umm

HB: I can get some cheap stuff, it's just not going to be as good.

CHS: Well I told you, I don't need those not good man, I mean, I mean most of these people that want to buy is Mexican, Mexicans pretty much you know

HB: Now how about, let me ask this. Let me get, let me uhh finish all this up, and I'll just let you try. You know what I'm saying?

CHS: I want it quick. I want it quick. I want it quick because I want to get this money, so I can go back to Troy. So I can pay my storage, man.

HB: How much money you got on you now?

CHS: I mean I only got like, 220, 200 hundred.

HB: Ok

CHS: UI, and that's all

HB: Ok, alright uhh

CHS: But I don't want no bullshit, do not give me no bullshit, because I'm telling you, if I give this to them and there going

HB:  I'm not UI

CHS: Run their mouth

HB: It's the best around, I promise.

CHS: Just try this, just try this just one time, I mean shit

HB: It came from, it came from Texas

CHS: What? From Texas, whatever

HB: Yeah it came from Texas

CHS: Alright, well umm, what time, what time can you come here?

HB: Umm, I just got up, I'm getting dressed, getting my kids ready, and get them to the doctor's appointment and then I'm coming.

CHS: I didn't know you had kids now, man

HB: Yes

CHS: Damn, you should go home often

HB: Do what?

CHS: Go home often to your kids

HB: Do what now?

CHS: You should go home, come home

HB: I am home, what you talking about, I am home

CHS: Because most of the time you're in the street. Alright well, hey, hurry up man, please

HB: Ok, I gotcha, I'll be there

CHS: Ok so, 200

HB: Yes

CHS: 180

HB:  Two, will talk about it when I get there, I gotcha, I'll do the best I can for you.

6

CHS: You better hurry up man, I need to go, I need to move, cause I'm not

HB: Ok,

CHS: I can't s here no more

HB: Ok, it's just like you say, your kids come first, my kids come first. Ok once I get my kids done, I gotcha. I promise

CHS: Alright, so 180? Two hundred

HB: Two hundred

CHS: Shit, alright

HB: I don't know, will talk about it when I get there

CHS: Alright

HB: I'll do the best I can for you. I promise you that

CHS: Hurry up please,

HB: Ok I gotcha, bye

[End of call]

13.     Based on my knowledge of this investigation, I know that during the phone call,

BRIDGES and the CHS discussed the purchase of seven grams of Ice for approximately $200

based on the evidence that: (i) BRIDGES did not hesitate or show any signs of confusion while

discussing the sale of a controlled substance for hundreds of dollars in cash; (ii) the CHS and

BRIDGES are both well-known Ice distributors in the area; and (iii) the CHS had purchased Ice

directly from BRIDGES in the past.  Furthermore, based on my training and experience, the

referenced price is generally consistent with the street value for that amount of Ice in the Dothan

area.

14.     Later that same day, on July 24, the CHS, under FBI supervision, made a second

recorded call to BRIDGES, via the Target Cell Phone, in an effort to purchase an additional

controlled substance, heroin.  At the beginning of the phone call, the CHS exchanged a mumbled

greeting and the first intelligible word was "heroin." The remainder of that conversation is as follows:

> CHS: UI, heroin, alright, because I really don't know, but this chick right here in the umm trailer park. I mean
>
> HB: What now?
>
> CHS: I mean how much, I don't know
>
> HB: I got like a gram or two
>
> CHS: How much is it?
>
> HB: I mean
>
> CHS: What's the profit, I mean, you got to teach me all the heroin, because I never dealt it [the CHS was previously a known Ice dealer and is acting like they are attempting to start selling Herion]
>
> HB: UI you know it's just the cost, right?
>
> CHS: Not really, because last time, you know, last time someone offered it to me, it was a Ki [common term for Kilo], I don't know about the
>
> HB: Its 150 dollars a gram
>
> CHS: Shit, so how much can I make, I mean how can I make money? UI, you're going to have to give me room, you know, because I'm not dealing it for free
>
> HB: Right, I'm getting ready, I'm about to head your way in just a minute will talk about it when I get there
>
> CHS: Alright man, hurry up
>
> HB: I gotcha
>
> [End of call]

15.     Based on my knowledge of this investigation, I know that during this phone call BRIDGES and the CHS discussed the purchase of heroin, for approximately $150 per gram. It should again be noted that Bridges does not show any sign of confusion while discussing the details of a drug deal for heroin. Furthermore, based on my training and experience, the referenced price is generally consistent with the street value for a gram of heroin in the Dothan area.

16.    Later that same day, on July 24, the FBI and the Dothan Police Department attempted to conduct a controlled purchase of Ice from BRIDGES.  The CHS and BRIDGES originally agreed to meet in the Lowes parking lot (2671 Ross Clark Circle Dothan, Alabama 36301) in order to complete the transaction.  However, the controlled purchase was unsuccessful. Prior to the meet-up, BRIDGES informed the CHS that he could not fulfill his end of the drug deal.  Specifically, BRIDGES apologized and stated that he had lost his keys to the place where he stores his product.  All of the above communications were transferred through the Target Cell Phone.  Some of the communications were unrecorded calls, and the remainder were text messages as shown in the screenshots below (the texts on the left side originated from the Target Cell Phone).



AUGUST COMMUNICATIONS

17.    On or about August 10, 2017, BRIDGES called the CHS.  The CHS responded by
text message that same day, saying "u called."  Within a few minutes, BRIDGES responded back
by saying "Got some fire."  Based on my training and experience, "fire" is a common street name
for methamphetamine.  The CHS responded a few hours later "oh yea."  On or about August 16,
2017, BRIDGES called the CHS again (but the CHS did not answer).  Those communications are
reflected in the screenshots below (the texts on the left side originated from the Target Cell Phone).



18.     In sum, Bridges is known to be a drug dealer by the CHS, law enforcement, and other members of the public.  There is also evidence that BRIDGES has used the Target Cell Phone, based on the CHS's information as well as the fact that BRIDGES (a known drug dealer) did not show any signs of confusion while discussing the details of two drug deals.  Finally (and regardless of the known connections of Bridges to the Target Cell Phone), there is *direct evidence* that the Target Cell Phone was used on multiple occasions to setup various drug deals.  Thus, there is probable cause to believe that the Target Cell Phone (and its associated account) was used to commit a crime (violations of Title 21, United States Code, Section 841(a)(1) and/or Section 846), and will have evidence of the same (as detailed below).

## VERIZON WIRELESS' CAPABILITIES

19.     In my training and experience, I have learned that Verizon Wireless is a company that provides cellular telephone access to the general public, and that stored electronic communications, including retrieved and unretrieved voicemail, text, and multimedia messages for Verizon Wireless subscribers may be located on the computers of Verizon Wireless.

20.     Wireless phone providers often provide their subscribers with voicemail services. In general, a provider will store voicemail messages on behalf of a particular subscriber until the subscriber deletes the voicemail.  If the subscriber does not delete the message, the message may remain in the system of Verizon Wireless for weeks or months.

21.     Among the services commonly offered by wireless phone providers is the capacity to send short text or multimedia messages (photos, audio, or video) from one subscriber's phone or wireless device to another phone or wireless device via one or more wireless providers.  This service is often referred to as "Short Message Service" ("SMS") or "Multimedia Messaging Service" ("MMS"), and is often referred to generically as "text messaging." Based on my

knowledge and experience, I believe that stored electronic communications, including SMS and MMS messages that have been sent or received by subscribers, may be stored by Verizon Wireless for short periods incident to and following their transmission (*but never stored for longer than ten days*).

22.     Wireless phone providers typically retain certain transactional information about the use of each telephone, voicemail, and text-messaging account on their systems.   This information can include log files and messaging logs showing all activity on the account, such as local and long distance telephone connection records, records of session times and durations, lists of all incoming and outgoing telephone numbers or e-mail addresses associated with particular telephone calls, voicemail messages, and text or multimedia messages.   Providers may also have information about the dates, times, and methods of connecting associated with every communication in which a particular cellular device was involved.

23.     Wireless providers may also retain text messaging logs that include specific information about text and multimedia messages sent or received from the account, such as the dates and times of the messages.   A provider may also retain information about which cellular handset or device was associated with the account when the messages were sent or received.   The provider could have this information because each cellular device has one or more unique identifiers embedded inside it. Depending upon the cellular network and the device, the embedded unique identifiers for a cellular device could take several different forms, including an Electronic Serial Number ("ESN"), a Mobile Electronic Identity Number ("MEIN"), a Mobile Identification Number ("MIN"), a Subscriber Identity Module ("SIM"), an International Mobile Subscriber Identifier ("IMSI"), or an International Mobile Station Equipment Identity ("IMEI"). When a cellular device connects to a cellular antenna or tower, it reveals its embedded unique identifiers

to the cellular antenna or tower in order to obtain service, and the cellular antenna or tower records those identifiers as a matter of course.

24.     Many wireless providers retain information about the location information of where a particular communication was transmitted or received.  Based on my training and experience, I know that Verizon Wireless has the technical capabilities to produce cell-site data, also known as "tower/face information" or cell tower/sector records.  Cell-site data allows them to collect and generate information about the locations of the cellular telephones to which they provide service by identifing the "cell towers" (i.e., antenna towers covering specific geographic areas) that received a radio signal from the cellular telephone and, in some cases, the "sector" (i.e., faces of the towers) to which the telephone connected.  Based on my training and experience, I also know that Verizon Wireless can collect *historic* as well as *prospective* cell-site data.

25.     Wireless providers also maintain business records and subscriber information for particular accounts.  This information could include the subscribers' full names and addresses, the address to which any equipment was shipped, the date on which the account was opened, the length of service, the types of service utilized, the ESN or other unique identifier for the cellular device associated with the account, the subscribers' Social Security Numbers and dates of birth, all telephone numbers and other identifiers associated with the account, and a description of the services available to the account subscribers.  In addition, wireless providers typically generate and retain billing records for each account, which may show all billable calls (including outgoing digits dialed).  The providers may also have payment information for the account, including the dates, times and sometimes, places, of payments and the means and source of payment (including any credit card or bank account number).

26.     In some cases, wireless subscribers may communicate directly with a wireless provider about issues relating to the account, such as technical problems, billing inquiries, or complaints from other users.     Wireless providers typically retain records about such communications, including records of contacts between the user and the provider's support services, as well records of any actions taken by the provider or user as a result of the communications.

27.     As explained below, information stored at the wireless provider, including that described above, may provide crucial evidence of the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element or alternatively, to exclude the innocent from further suspicion.  In my training and experience, the data pertaining to a particular cellular device that is retained by a wireless provider can indicate who has used or controlled the cellular device.  This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence. For example, data collected at the time of account sign-up, information relating to account payments, and communications (and the data associated with the foregoing, such as date and time) may indicate who used or controlled a cellular device at a relevant time.  Further, such stored electronic data can show how and when the cellular device and associated cellular service were accessed or used.     Such "timeline" information allows investigators to understand the chronological context of cellular device usage, account access, and events relating to the crime under investigation.  This "timeline" information may tend to either inculpate or exculpate the cellular device owner.  Additionally, information stored by the wireless provider may indicate the geographic location of the cellular device and user at a particular time (e.g., cell-site location information; location integrated into an image or video sent via text message to include both

14

metadata and the physical location displayed in an image or video). Last, stored electronic data may provide relevant insight into the state of mind of the cellular device's owner and/or user as it relates to the offense under investigation. For example, information relating to the cellular device in the possession of the wireless provider may indicate the owner's motive and intent to commit a crime (e.g., communications relating to the crime), or consciousness of guilt (e.g., deleting communications in an effort to conceal them from law enforcement).

## CONCLUSION AND AUTHORIZATION REQUEST

28.     Based on the foregoing, I request that the Court issue the proposed search warrant. This Court has jurisdiction to issue the requested warrant because it is "a court of competent jurisdiction" as defined by 18 U.S.C. § 2711. 18 U.S.C. §§ 2703(a), (b)(1)(A) & (c)(1)(A). Specifically, the Court is "a district court of the United States . . . that – has jurisdiction over the offense being investigated." 18 U.S.C. § 2711(3)(A)(i).

29.     Pursuant to 18 U.S.C. § 2703(g), the presence of a law enforcement officer is not required for the service or execution of this warrant.

30.     I further request, pursuant to 18 U.S.C. § 3103a(b) and Federal Rule of Criminal Procedure 41(f)(3), that the Court authorize the officer executing the warrant to delay notice for ~~ninety (90)~~ thirty 30 *BB* *GB* days after the collection (authorized by the warrant) has been completed. There is reasonable cause to believe that providing immediate notification of the warrant may have an adverse result, as defined in 18 U.S.C. § 2705. Providing immediate notice to the subscriber or user of the Target Cell Phone would seriously jeopardize the ongoing investigation, as such a disclosure would give that person an opportunity to destroy evidence, change patterns of behavior, notify confederates, and flee from prosecution. *See* 18 U.S.C. § 3103a(b)(1). As further specified in Attachment B, which is incorporated into the warrant, the proposed search

15

warrant does not authorize the seizure of any tangible property. *See* 18 U.S.C. § 3103a(b)(2). Moreover, to the extent that the warrant authorizes the seizure of any wire or electronic communication (as defined in 18 U.S.C. § 2510) or any stored wire or electronic information, there is reasonable necessity for the seizure for the reasons set forth above. *See* 18 U.S.C. § 3103a(b)(2).

31.     I further request that the Court direct Verizon Wireless to disclose to the government any information described in Attachment B that is within the possession, custody, or control of Verizon Wireless. I also request that the Court direct Verizon Wireless to furnish to the government all information, facilities, and technical assistance necessary to accomplish the collection of the information described in Attachment B unobtrusively and with minimum interference with Verizon Wireless' services, including the collection of prospective cell-site data, by initiating a signal to determine the location of the Target Cell Phone on Verizon Wireless' network or with such other reference points as may be reasonably available, and at such intervals and times directed by the government. The government shall reasonably compensate Verizon Wireless for reasonable expenses incurred in furnishing such facilities or assistance.

32.     I further request that the Court authorize execution of the warrant at any time of day or night, owing to the potential need to locate the Target Cell Phone outside of daytime hours.

Respectfully submitted,

Heather S. Whelan Holt
Special Agent
Federal Bureau of Investigation

16

Subscribed and sworn to before me on _August 24_____, 2017


_____
HONORABLE GRAY M. BORDEN
UNITED STATES MAGISTRATE JUDGE
MIDDLE DISTRICT OF ALABAMA

## **ATTACHMENT A**

### **Property to Be Searched**

This warrant applies to information associated with the cellular telephone assigned call number (334) 618-3865 (the "Target Cell Phone") that is stored at a premises owned, maintained, controlled, or operated by Verizon Wireless, a wireless provider headquartered at 140 W. St. New York, NY 10007.

## ATTACHMENT B

### Particular Things to be Seized

To the extent that the information described in Attachment A is within the possession, custody, or control of Verizon Wireless, including any messages, records, files, logs, or information that have been deleted but are still available to Verizon Wireless, Verizon Wireless is required to disclose the following information to the government for each account or identifier listed in Attachment A:

a.      All voice mail, text, and multimedia messages stored and presently contained in, or on behalf of the account or identifier, from August 14, 2017 to present;

b.      All transactional information of all activity of the telephones and/or voicemail accounts described above, including log files, messaging logs, local and long distance telephone connection records, records of session times and durations, dates and times of connecting, methods of connecting, telephone numbers associated with outgoing and incoming calls, from July 1, 2017 to present;

c.      All text messaging logs, including date and time of messages, and identification numbers associated with the handsets sending and receiving the message, from July 1, 2017 to present;

d.      All business records and subscriber information, in any form kept, pertaining to the individual accounts and/or identifiers described above, including subscribers' full names, addresses, shipping addresses, date account was opened, length of service, the types of service utilized, ESN (Electronic Serial Number) or other unique identifier for the wireless device

associated with the account, Social Security number, date of birth, telephone numbers, and other identifiers associated with the account;

e.      Detailed billing records, showing all billable calls including outgoing digits, from July 1, 2017 to present;

f.      All payment information, including dates and times of payments and means and source of payment (including any credit or bank account number), from January 1, 2017 to present;

g.      Incoming and outgoing telephone numbers, from July 1, 2017 to present;

h.      All records indicating the services available to subscribers of individual accounts and/or identifiers described above;

i.      All records pertaining to communications between Verizon Wireless and any person regarding the account or identifier, including contacts with support services and records of actions taken;

j.      All *historic* cell-site data about the location of the Target Cell Phone, including "cell towers" (i.e., antenna towers covering specific geographic areas) and "sectors" (i.e., faces of the towers) that receive a radio signal from the Target Cell Phone, from July 1, 2017 to present; and

k.      All *prospective* cell-site data about the location of the Target Cell Phone, including "cell towers" (i.e., antenna towers covering specific geographic areas) and "sectors" (i.e., faces of the towers) that receive a radio signal from the Target Cell Phone, for a period of thirty days, starting on August 24, 2017 (or as soon as practicable), during all times of the day and night. To the extent that the information described in this paragraph, prospective cell-site data, is within

2

the possession, custody, or control of Verizon Wireless, Verizon Wireless is required to disclose the prospective cell-site data to the government. In addition, Verizon Wireless must furnish the government all information, facilities, and technical assistance necessary to accomplish the collection of the prospective cell-site data unobtrusively and with minimum interference with Verizon Wireless' services, including by initiating a signal to determine the location of the Target Cell Phone on Verizon Wireless' network or with such other reference points as may be reasonably available, and at such intervals and times directed by the government. The government shall compensate Verizon Wireless for reasonable expenses incurred in furnishing such facilities or assistance.

3